[No. F017461. Fifth Dist. Apr. 15, 1993.]

In re RODERICK U., a Person Coming Under the Juvenile Court Law.
FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff
and Respondent, v.
DEBBIE L. et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts I, II, V, and VI of Discussion.*

**COUNSEL**

Donna L. Hall and James R. Goff, under appointments by the Court of Appeal, for Defendants and Appellants.

Phillip S. Cronin, County Counsel, and William G. Smith, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

THAXTER, J.—Debbie L. and Robert U. appeal from the order terminating their parental relationship with Roderick U. (Welf. & Inst. Code,[1] § 366.26). They raise a variety of procedural claims related to the section 366.26 hearing and the fact that a referee conducted the proceeding without the parents' stipulation. They also attack the sufficiency of the evidence to support the referee's adoptability finding because the minor, an African-American, had been placed since birth with Caucasian foster parents who wished to adopt him. We reject all of the parents' claims of error and affirm.

### STATEMENT OF CASE AND FACTS

The minor was born January 1, 1990, with a positive toxicology screen for cocaine. Both parents had substance abuse problems which rendered them

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

incapable of caring for Roderick. They were also incarcerated and as a result were unable to provide a suitable home for the child. Consequently at a March 1990 jurisdiction/disposition hearing, the juvenile court found Roderick came within the provisions of section 300, subdivisions (b) and (g) and adjudged the minor a dependent child of the court.

The court found by clear and convincing evidence that the minor should be placed in out-of-home care since the parents were in custody and needed to resolve their drug abuse problems. The child was placed in a special needs foster-care home. The court ordered reunification services for both parents which consisted of: participating in substance abuse evaluation, successfully completing all recommended treatment, participating in and completing parenting classes including whatever training was necessary to deal with a child with special medical needs, and visitation.

At a six-month review hearing in August 1990, the court continued Roderick's dependency and out-of-home placement. Both parents remained in custody; neither had fully complied with the reunification plan. The court instructed the Fresno County Department of Social Services (Department) to assist in finding the mother placement in a drug treatment program so that she could obtain an early release from jail. Roderick had stabilized in the meantime and was doing very well, according to his foster mother, Mrs. H.

By the time of the 12-month review, the parents had still failed to comply with the case plan. Specifically, the court found the father had been out of custody since January 31, 1991; his primary concern as well as that of his parole officer was keeping him drug-free. He had neither participated in reunification nor had he made any progress toward alleviating his drug problem. As for the mother, the court found she had not completed parenting classes and had been incarcerated for much of the reunification period. The mother anticipated an immediate commitment to The Third Floor, a substance abuse treatment program. Given the possibility the mother might complete the drug treatment portion of her reunification plan, the court continued reunification for the full 18-month period. The court also continued the minor's dependency and foster placement.

The father was once again in state prison by the time of the 18-month review hearing. The mother was also incarcerated. Apparently, the same day the authorities released her to The Third Floor program, she left without approval. When later found, she was arrested. Neither parent had completed a drug treatment program. As a result, the risk to Roderick's well-being remained unchanged.

The court found by clear and convincing evidence that to return the minor to a parent at that time would create a significant risk of detriment to his

physical or emotional well-being. There was also no substantial probability that such a return could be effected within the next six months. The court further found by clear and convincing evidence that the Department had made reasonable efforts to implement a service plan directed to the underlying basis for dependency.

The court ordered that reunification services be terminated and set the matter for a section 366.26 permanency planning hearing in November 1991. The cause had to be set over until February 1992 because the Department was unable to properly serve the father with notice of the hearing. In addition, although the parents had stipulated to the referee as a temporary judge to conduct the previous hearings in this matter, they would not execute a stipulation for the section 366.26 hearing.

At the section 366.26 hearing, the Department recommended adoption as the permanent plan. An adoptions social worker explained Roderick had been placed with his foster family since he was six days old; he knew no other care provider. He was "very well-adjusted" in his foster home and there had been only infrequent visits between Roderick and his parents.

The foster mother testified about her family's willingness and desire to adopt Roderick. She was cross-examined regarding her ability as a Caucasian to raise an African-American child, such as Roderick. Mrs. H. volunteered that she had raised a child of Hispanic descent, but not an African-American child. She explained she lived in an interracial neighborhood and had Black neighbors; Roderick would go to school with African-American boys and girls. She said she would do whatever it took to be certain Roderick was aware of who he was and to be proud of it.

At the conclusion of the hearing, the referee found by clear and convincing evidence Roderick was adoptable and it was likely the child would be adopted. In this regard, the referee specifically found that the foster mother's testimony was very credible. The referee further determined none of the factors outlined in section 366.26, subdivision (c)(1), which would render adoption detrimental, existed. Accordingly, the referee found termination of parental rights would be in Roderick's best interests and therefore declared the minor free from his parents' custody and control.

The parents applied for a rehearing. The juvenile court judge denied their applications. ▉▉▉ The parents filed timely notices of appeal.[2]

[2]Actually, the father filed his notice before he filed his application for rehearing. The time to file a notice of appeal commenced after the referee's decision became final which was

DISCUSSION

I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *Adoptability*

 Mother and father contend evidence that a family ethnically different from the minor wants to adopt him is insufficient evidence that he is likely to be adopted. In addition, they contend freeing Roderick for adoption by a Caucasian family was not in his best interests.

The parents premise their arguments on statutes which identify adoption placement preferences based on racial background or ethnic identification.[3] In particular, whenever a child is being considered for adoption and relative placement is not possible, placement in a family with the same racial

---

when the judge denied the rehearing applications. (Cal. Rules of Court, rules 39 & 39.1.) Thus, the father's notice was premature. Ordinarily, the appellate court will liberally construe premature notices if the respondent is not misled or prejudiced. (*Marcotte* v. *Municipal Court* (1976) 64 Cal.App.3d 235, 239 [134 Cal.Rptr. 314].) In this case, the respondent does not challenge the adequacy of the father's notice.

*See footnote, *ante*, page 1543.

[3]These statutes are Civil Code sections 222.35, 222.36, and 222.37. They provide:

"Whenever a child is being considered for adoption, the following order of placement preferences regarding racial background or ethnic identification shall be used, subject to the provisions of this section, in determining the adoptive setting in which the child should be placed:

"(a) In the home of a relative.

"(b) If a relative is not available, or if placement with available relatives is not in the child's best interest, with an adoptive family with the same racial background or ethnic identification as the child. If the child has a mixed racial or ethnic background, placement shall be made with a family of the racial or ethnic group with which the child has the more significant contacts.

"(c) If placement cannot be made under the rules set forth in this section within 90 days from the time the child is relinquished for adoption or has been declared free from parental custody or control, the child is free for adoption with a family of a different racial background or ethnic identification where there is evidence of sensitivity to the child's race, ethnicity, and culture. The child's religious background shall also be considered in determining an appropriate placement. A child may not be free for adoption with a family of a different racial background or ethnic identification pursuant to this subdivision however, unless it can be documented that a diligent search meeting the requirements of [Civil Code] Section 222.37 for a family meeting the placement criteria has been accomplished." (Civ. Code, § 222.35.)

"A determination of good cause not to follow the rules set forth in [Civil Code] Section 222.35 may be based on one or more of the following considerations:

"(a) Request of the parent or parents.

"(b) The extraordinary physical or emotional needs of the child.

"(c) The child is legally free for adoption for a period exceeding 90 days during which a diligent search was conducted, and no family meeting the placement preference criteria is

background or ethnic identification as the child is preferred. (Civ. Code, § 222.35, subd. (b).) Adoptive placement with a family of a different racial background or ethnic identification is possible only if: a same race or ethnicity placement cannot be made within 90 days from the time the child has been declared free from parental custody; a diligent search for families of the same race or ethnic identification has been conducted; and there is evidence of sensitivity to the child's race, ethnicity and culture. (Civ. Code, §§ 222.35, subd. (c), 222.37.) There is no published case law on these provisions, which went into effect January 1991.

The parents argue that for the juvenile court to free Roderick for possible adoption by a Caucasian family is "cultural genocide." According to them, the child will not only lose his biological family but also important cultural ties. The parents also complain the Department did not offer evidence that Roderick would be adopted by any other person. Thus, from the parents' perspective, the minor's foster family is not "ethnically appropriate" for purposes of adoption, and because there was no evidence of other prospective adoptive parents with the same racial background as Roderick, the adoptability finding was not supported by sufficient evidence.

The parents' argument is undermined by the very statutes upon which they rely. Civil Code section 222.38 limits the use of the placement preference statutes. It provides:

"[Civil Code s]ections 222.35 to 222.37, inclusive, shall be applicable only in determining the placement of a child who has been relinquished for adoption or has been declared free from the custody and control of the parents." (Civ. Code, § 222.38.) Arguably, therefore, the parents in a dependency proceeding cannot look to these preference statutes in arguing the adoptability issue.

---

available for placement. Documentation shall be necessary in order to make a finding of good cause under this section.

"(d) Application of these rules would not be in the best interests of the child." (Civ. Code, § 222.36.)

"Every public or private agency shall maintain records for the placement of each child to show that a diligent search has been conducted for families meeting the criteria of [Civil Code] Section 222.35, and in accordance with diligent search rules which shall be adopted by the department. In conducting a diligent search, each agency shall use all appropriate resources, as necessary, in a directed effort to recruit a family meeting the placement preference criteria through (a) the use of all appropriate intra-agency and interagency, state, regional, and national exchanges and listing books, (b) child-specific recruitment in electronic and printed media coverage, and (c) the use of agency contacts with parent groups to advocate for specific waiting children.

"Records of agencies maintained pursuant to this section may be reviewed upon request by the state department." (Civ. Code, § 222.37.)

Even assuming the preference statutes have some bearing on the adoptability issue, they do not aid the parents here. We must uphold the adoptability finding if there was clear and convincing evidence that Roderick's adoption would be realized within a reasonable time. (*In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065 [280 Cal.Rptr. 503]; *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223 [4 Cal.Rptr.2d 101].)

The juvenile court found Roderick was likely to be adopted based on the foster mother's undisputed testimony:

"The testimony of the care provider was very credible. I don't think there's any doubt at all that she would be more than willing to adopt the minor. She and her husband and their family would be more than willing to adopt Roderick if he is freed for adoption."

Civil Code sections 222.35 through 222.37 do not disqualify the foster parents as potential adoptive parents. The statutes merely give preference to Roderick's relatives and others sharing his racial background. In placing Roderick for adoption, the Department will either have to: find an adoptive family with the same racial background as Roderick (Civ. Code, § 222.35, subd. (b)); show a diligent search pursuant to Civil Code section 222.37 has been made for a family meeting the placement criteria (Civ. Code, § 222.35, subd. (c)); or show good cause not to follow the rules set forth in Civil Code section 222.35 (Civ. Code, § 222.36). In any event, Roderick can be adopted either by a family with the same racial background or by his foster family. This is not a case in which adoptability is uncertain. The only question is who will adopt the minor.

Consequently, there was sufficient evidence to support the juvenile court's finding that Roderick was likely to be adopted.

IV. *The Referee's Authority to Preside Over the Termination Hearing*

■■■ The parents contend the juvenile court referee lacked the necessary jurisdiction to conduct the section 366.26 proceeding because they would not stipulate to the referee hearing the matter.

Our state Constitution enables the Legislature to "provide for the appointment by trial courts of record of officers such as commissioners to perform subordinate judicial duties." (Cal. Const., art. VI, § 22.) Pursuant to this authority, the Legislature has enacted section 247 permitting the presiding judge of a juvenile court to appoint one or more referees to serve on a full-time or part-time basis.

In turn, section 248 empowers a referee to exercise the same judicial authority as a judge of the juvenile court, except in hearings to which the state or federal constitutional prohibitions against double jeopardy apply.[4] A referee may sit as a temporary judge if the parties so stipulate. (Cal. Const., art. VI, § 21.) When a referee sits as a temporary judge, his or her orders become final in the same manner as orders made by a judge. (§ 250.)

When the referee does not sit as a temporary judge, a parent or minor may apply to the juvenile court for a rehearing. (§§ 250, 252.) If the court grants the application, all rehearings of matters heard before a referee shall be before a judge of the juvenile court and shall be conducted de novo. (§ 254.)

Even when a parent is unwilling to stipulate that a referee may act as a temporary judge, the referee may nonetheless conduct juvenile dependency proceedings. The stipulation is not necessary to empower a referee; it is only necessary to give his or her acts finality. The absence of a stipulation does not deprive the referee of jurisdiction. (*In re Lamonica H.*(1990) 220 Cal.App.3d 634 [270 Cal.Rptr. 60].)

The father cites several opinions arising from section 602 proceedings, including *In re Perrone C.* (1979) 26 Cal.3d 49 [160 Cal.Rptr. 704, 603 P.2d 1300], *In re Mark L.* (1983) 34 Cal.3d 171 [193 Cal.Rptr. 165, 666 P.2d 22], and *In re P. I.* (1989) 207 Cal.App.3d 316 [254 Cal.Rptr. 774]. None of those decisions supports the parents' argument on the issue before us.

The appeal in *Perrone C.* arose from a jurisdictional finding of guilt against a minor. (*In re Perrone C., supra,* 26 Cal.3d at p. 52.) Based on a due process claim, the high court held a juvenile court referee could not hold a jurisdictional hearing absent a stipulation by the parties. The court reasoned if the referee acquitted or dismissed the petition, the referee's decision would be a final determination because a rehearing would constitute double jeopardy. Therefore, it was constitutionally invalid for a referee to acquit a minor because a referee can only perform "subordinate judicial acts." (*Id.* at pp. 55-56.) Additionally, a proceeding in which the trier of fact could only find against the accused, even if only advisory, would be a "blatant violation of constitutional standards." (*Id.* at p. 56.) A judge, on application for rehearing, could not acquit the minor unless the judge conducted a second trial. (*Id.* at p. 57.) Thus, the Supreme Court prohibited juvenile court referees from conducting section 602 jurisdiction and disposition hearings in the absence of a stipulation.

---

[4]This statutory exception does not pertain in juvenile dependency matters. (*In re Carina C.* (1990) 218 Cal.App.3d 617, 624 [267 Cal.Rptr. 205].)

In *In re Mark L.*, *supra*, 34 Cal.3d 171, the Supreme Court indicated that a referee, absent a stipulation as a temporary judge, could not make a final or binding disposition after accepting the minor's admission of a section 602 petition if the minor did not waive his *Arbuckle*[5] rights. (*In re Mark L.*, *supra*, at p. 177.) By purporting to make a final disposition, the referee arguably would violate the "subordinate judicial duties" clause (Cal. Const., art. VI, § 22) as well as the statutory provisions of sections 250-254. (*In re Mark L.*, *supra*, at p. 177.) A subsequent order by a judge of the juvenile court vacating the referee's disposition and making a new disposition after rehearing would violate the minor's right to be sentenced by the same judicial officer accepting his admission. (*Ibid.*)

■ Dependency cases do not present the double jeopardy and *Arbuckle* considerations at stake in *Perrone C.* and *Mark L.* Section 300 matters are civil in nature, designed not to prosecute the parents but to protect the child. (*In re Carina C.*, *supra*, 218 Cal.App.3d at p. 624.) The *Perrone C.* and *Mark L.* decisions have no bearing on a referee's jurisdiction to hear matters under section 366.26.

*In re P. I.*, *supra*, 207 Cal.App.3d 316, simply related to whether there was an adequate stipulation for the referee to act as a temporary judge at the dispositional, as well as the jurisdictional, hearing. Here the referee did not purport to act as a temporary judge at the permanency planning hearing, and respondent does not claim that the earlier stipulation extended to the section 366.26 hearing. *In re P. I.* does not apply here.

Both parents also rely on language in section 366.26, subdivision (h) to support their claim. Section 366.26, subdivision (h) provides:

"Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the minor person, upon the parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. After making such an order, the court shall have no power to set aside, change, or modify it, but nothing in this section shall be construed to limit the right to appeal the order."

■ According to the parents, section 366.26, subdivision (h) bars a rehearing and therefore the section 366.26 hearing should not be heard by a referee without a stipulation from the parties. The parents do not cite any case law authority for this proposition.

---

[5]*People* v. *Arbuckle* (1978) 22 Cal.3d 749 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171].

The parents' interpretation of section 366.26, subdivision (h) appears strained and unreasonable. Most notably, the provision says nothing about barring a rehearing or prohibiting a referee in the absence of a stipulation from conducting a section 366.26 hearing. Rather, it expressly prohibits the modification of an order terminating parental rights.

In addition, the provision is phrased in such a way that if, as the parents urge, it barred rehearing, it would only do so when parental rights were terminated. A referee's order for legal guardianship or long-term foster care would still be subject to rehearing. Thus, if the parents were correct, the juvenile court would be placed in the awkward position of having to predict prior to the hearing whether it was likely to result in a termination order, before deciding whether the matter could be safely set for hearing before a referee.

Further, the parents read this provision without any consideration of sections 249 through 252 or the court rule implementing those statutes.[6] Except under circumstances which are inapplicable here, a referee's order becomes final 10 calendar days after service of the order and findings unless an application for rehearing has been timely made or the court has ordered rehearing on its own motion. (§§ 249, 250; Cal. Rules of Court, rule 1417.) Under traditional rules of statutory interpretation, section 366.26, subdivision (h) must be read in the context of the entire statutory scheme. Accordingly, a termination order, issued by a referee who hears the matter in the absence of the parties' stipulation, becomes conclusive and binding upon the parties if, 10 calendar days after service of the order, no one applies for rehearing or rehearing is not otherwise ordered.

The father separately argues a termination hearing conducted by a referee subject to a rehearing process before a superior court judge violates his due process rights. He does not articulate how the procedures outlined in section 248 et seq. constitute a due process violation. Neither does he cite any case which supports his position.

---

[6]California Rules of Court, rule 1417 provides:

"(a) Except as provided in subdivision (b) and subject to the right of review provided for in rule 1418, all orders of a referee shall become effective immediately and shall continue in effect unless vacated or modified upon rehearing by order of a juvenile court judge.

"(b) The following orders made by a referee shall not become effective unless expressly approved by a juvenile court judge within two court days:

"(1) Any order removing a child from the physical custody of the person legally entitled to custody; or

"(2) Any order the presiding judge of the juvenile court requires to be expressly approved.

"(c) An order of a referee shall become final 10 calendar days after service of a copy of the order and findings under rule 1416, if an application for rehearing has not been made within that time or if the judge of the juvenile court has not within the 10 days ordered a rehearing on the judge's own motion under rule 1418."

The father refers to *In re Larry W.* (1971) 16 Cal.App.3d 290 [94 Cal.Rptr. 31] as apparent authority for his argument. He finds solace in the following language from *Larry W.*: "[w]here there is a dispute as to what the law is, that dispute is better presented to a reviewing court in the form of a decision of the trial court upon a specific factual situation . . . ." (*In re Larry W., supra*, 16 Cal.App.3d at p. 292.) Even a cursory reading of *Larry W.*, however, shows that the quoted language, in context, has no pertinence here. *Larry W.* involved an application for habeas corpus relief from a juvenile court detention order in a section 602 proceeding. The petitioner/minor had not applied to the presiding judge of the juvenile court to challenge the order. His stated excuse for not doing so was that such an application would be a futile act, alleging a widespread failure of the juvenile court to follow a particular Supreme Court decision. (16 Cal.App.3d at p. 292.) The appellate court responded:

"We do not approve of this deliberate bypass of the juvenile court judge. We do not assume the superior court is deliberately ignoring the law. Where there is a dispute as to what the law is, that dispute is better presented to a reviewing court in the form of a decision of the trial court upon a specific factual situation, and not upon the public defender's allegation of how he thinks the superior court would rule." (*In re Larry W., supra*, 16 Cal.App.3d at p. 292.) This is hardly authority for the father's proposition that a juvenile court referee cannot conduct a section 366.26 hearing in the absence of a stipulation.

Based on the foregoing, we conclude that the referee, even in the absence of the parties' stipulation, had the necessary jurisdiction to conduct the section 366.26 hearing.

V., VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Judgment affirmed.

Vartabedian, Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied May 14, 1993, and appellants' petition for review by the Supreme Court was denied July 22, 1993.

---

*See footnote, *ante*, page 1543.